## CHARLESTON.

M. GERTRUDE KEARNS *et als.* *v.* CARRIE M. ROUSH *et als.*

(No. 6340)

Submitted February 5, 1929. Decided February 12, 1929.

*Kilmer & Byrer,* for plaintiff in error.

*H. H. Emmert* and *Martin & Seibert,* for defendants in error.

WOODS, PRESIDENT:

This case deals with the effect of several testamentary papers, all in the handwriting of Dr. J. Whann McSherry,

which were presented for probate shortly after their author's death.

Dr. J. Whann McSherry, a very prominent citizen of Martinsburg, died the latter part of January, 1928, at the age of ninety-four years. He was born and reared in Berkeley county and had resided there almost all his entire life. For a number of years he had been president of the Citizens National Bank of Martinsburg.

The record shows that on February 18, 1914, Dr. McSherry made a holographic will, believing, as he said, that he was in duty bound to make a will to protect his wife and family. At that time he desired all of his property, real and personal, to be converted into cash or negotiable notes, one-fourth of the proceeds to be placed in trust and the interest to be paid quarterly to his nephew, James McSherry Gosnell, if he should be sober and responsible, but if he would not work and support his family, then the interest was to be paid to his daughter, Marie Gertrude Gosnel, for the benefit of her mother, sisters and brother, until the children become of age, and that part of the fund then was to be divided among those living children, share and share alike. The residue was to be placed in trust, and the interest to be paid to his wife, Mrs. Virginia McSherry, during her life, and at her death one-fourth thereof was to be placed in trust for the said Gosnell, the interest to be paid to him. Of the remainder of this trust fund there was to be paid Two Thousand Dollars, or its interest, to the Vestry of the Episcopal Church, as long as there was a church in Martinsburg, the interest of Two Thousand Dollars was to be paid to the Board of Directors of the King's Daughters Hospital, the interest to be used as they deemed proper; and the balance of the money, in trust, was to be invested by the trustee, and the interest was to be paid to such of his relatives as may be in need and were worthy people. It ends, ''I ask that Edward Rutledge and Charles A. Young will act as executors.''

Sometime thereafter, certainly not before the 21st day of August, 1921, nor later than a short time before his death, or not less than seven nor more than fourteen years after the will of 1914, Dr. McSherry made another will, which is not

dated. It is conceded, however, on account of the facts before the Court that although the will is not dated, it must have been made after August 21, 1921. This latter will begins: "This is my last will, *which I write now*, being of sound mind, and fairly good health. I will my soul to Almighty God, and my body to the earth. Amen." He leaves two one-hundredths of his estate to Rev. Andrew McKeefry, of the Roman Catholic Church, in honor of his earthly parent, Denis Lilly McSherry, deceased; eight one-hundredths to the Trinity Episcopal Church Vestry, in honor of his mother and sisters, in trust. He desires that amount put in a trustee's hands and proper security taken, the interest to be paid semi-annually to the Vestry for the benefit of the church. One-tenth he devises to C. J. Faulkner, his life long friend and brother-in-law, for life, then to Mary Buckner Faulkner and Sallie F. Snodgrass. One-tenth to Mary Faulkner Fuller, in trust, for Virginia and Douglas Smith, Virginia's share in trust to go to her son, James Douglas Dushane, at her death. One-tenth to the children of Lionel Ward Gosnell, his nephew, share and share alike, when they become thirty years of age, or to the survivors of them. One-tenth to Miss Bettie Hunter for life and at her death to Mrs. Mary L. Doll for life, and at her death to the children of Mrs. Martha Hunter Riddle; One Thousand Dollars to Virginia McSherry Trammell, Two Thousand Dollars to Mr. William E. Trammell to buy a home for her "herself", Five Thousand Dollars to King's Daughters' Hospital. The balance to be loaned on first deed of trust at five per cent. for periods of twenty years, interest to be collected and invested each year on land mortgages and at the end of a hundred years all to be collected and given to the Trinity Episcopal Church at Martinsburg.

On January 11, 1928, Dr. McSherry made another holographic instrument as follows: "In case I should die before Mr. M. A. Snodgrass, I wish that he take complete control of our house or property and dispose of it altogether."

The county court of Berkeley county probated all of these testamentary papers as together constituting the true last will and testament of the testator, and qualified the said

Edward Rutledge, as executor of said estate. Subsequently an appeal was taken from this action of the county court to the circuit court, and that court, after having heard the evidence, reversed the county court in so far as it probated as part of the last will and testament of the testator the will of February 18, 1914, and also set aside the appointment and qualification of said Rutledge as executor. It is of this ruling of the circuit court that the plaintiff in error here complains.

Defendants in error take the position that the undated will by implication revoked the earlier will in toto, and that the facts surrounding the execution of the instrument likewise sustain such revocation. On the other hand, the plaintiff in error contends that inasmuch as the undated will did not expressly revoke the prior will, that it could operate as a revocation only to the extent that it is inconsistent therewith. He therefore argues that if the undated will is not wholly inconsistent with the will of 1914, that both said testamentary writings should be admitted to probate as the last true will and testament.

It is to be observed that the undated will does not in express terms revoke the prior will of 1914. Does it do so by implication? Revocation is avoiding and invalidating an instrument, which but for revocation would have been the last will and testament of the party by whom it was executed. Page on Wills, section 244. Swinburne long ago said: "No man can die with two testaments, and therefore the last and newest is in force, so that if there were a thousand testaments, the last of all is the best of all, and makes void the former." Swinburne, Wills, pt. 7, sec. 14, pl. 1, as cited in 1 Williams' Exrs. 9th Eng. ed., chap. 3, sec. 2. But under our statute and decisions the mere execution of a later does not imply the revocation of a former will. Chapter 77, section 7, Code. The mere use of the words "last will" in an instrument is insufficient, standing alone without any revocatory clause to justify a rejection of a prior will. *Gordon* v. *Whitlock*, 92 Va. 723. A later will complements a former where it does not make an entire disposition of the estate. However, where the second will makes a different disposition of the entire estate from that admitted to be made by the

first, it is of itself a sufficient revocation of the former. This rule is ancient, and well established. All text books and other such authorities touching on wills, so far as we have examined, state this to be the rule, and without citing a single decision to the contrary. 1 Schouler on Wills (5th ed.) §406; Thompson on Wills, sec. 462; Redfield on Wills, (3rd ed.) Chap. 7, sec. 5; Swinburne on Wills, pt. 7, sec. 14; 1 Jarman on Wills (6th ed.), chap. 7, sec. 17; 1 Underhill on Wills, sec. 251; Page on Wills, sec. 269; 1 Alexander on Wills, sec. 526; Kent's Com. 557; 40 Cyc. 1175; 28 R. C. L., sec. 132; Powell on Devisees, (3rd ed.) 541. A general statement of the rule is evolved from the decisions to the effect that a second will is a revocation of the first when it is apparent from the general tenor thereof that such was the intention of the testator. *Swann* v. *Housman*, 90 Va. 816; *Lazier* v. *Wright*, 304 Ill. 130, 136; *Simmons* v. *Simmons*, 26 Barb. (N. Y.) 68; *In re Teacle's Estate*, 153 Pa. 219; *Bobb's Succession*, 42 La. Ann. 40; *In re Fisher*, 4 Wis. 254, 65 Am. D. 209. This rule was adopted by this Court in the early days of our State. In *Carpenter* v. *Miller*, 3 W. Va. 174, that eminent jurist, JUDGE MAXWELL, speaking for the Court, said: "It is well settled that a second will inconsistent with the first, perfect in its form and execution but incapable of operating as a will on account of some circumstance *dehors* the instrument, may nevertheless be set up as a revocation of the first." In a later case, it was held that a codicil, inconsistent with the terms of the will and a substitution for it revoked the will itself. *Henry* v. *Haymond*, 77 W. Va. 173. The Court there decided it to be a cardinal rule of construction that, where some provision in a will is repugnant to a codicil, that the latter must prevail; it being the last expression of the testator's wish. Under such conditions the Supreme Court of Wisconsin, in *Re Edward Fisher*, *supra*, a case widely quoted in the decisions, pertinently said: "It is very apparent that a man cannot have two independent wills * * * at the same time, each acting upon the same subject matter, and each professing to make a distinct and full disposition of such subject matter."

An inspection of the two papers makes inescapable the conclusion that the undated will disposes of the entire estate

of the testator. While the writer does not say so, it is apparent that he desires his property to be converted into cash, out of which the payments to the devisees are to be made. The plaintiff in error to avoid the application of the rule to the present case contends that the undated will does not dispose of all the testator's property, in this, that the residuary clause in the undated will is void for uncertainty, and, assuming this to be so, it operated to leave approximately one-half of the testator's property undisposed of. To determine whether such bequests were void, however, would arise upon a bill filed to test the validity of a will. *Couch* v. *Eastham*, 27 W. Va. 796. It must be remembered that the proceeding here is merely one to probate the last will and testament of the testator, and is not a suit to construe the will. The Supreme Court of Virginia recently said in *Whittle* v. *Roper*, 149 Va. 896, that courts, in admitting a will to probate, are confined to the single question of whether the paper admitted to probate was the true last will and testament of deceased, and cannot be extended further since the jurisdiction of a court to probate is not to ascertain and enforce the rights of property, but to establish, preserve and perpetuate an important muniment of title. To the same effect, *Ward* v. *Brown*, 53 W. Va. 227, and cases there cited. In view of this, it is self-evident that we cannot determine the validity of a devise in this proceeding. We have not the parties in interest before us. It is patent that a paper may be the last will and testament of a testator, though the bequests in a measure may be invalid. Even the adjudged invalidity of the bequest in a proper proceeding would not bring to life a former will. It must not be lost sight of that *the intention of a testator to revoke a will* is a circumstance which constitutes the revocation. And, when that appears in a subsequent will, it is sufficient, although such subsequent will should not take effect, from any disability in a devisee. *Forney* v. *Ferrell*, 4 W. Va. 729; *Carpenter* v. *Miller, supra;* 3 Lomax, Digest, 61. Though what was done here by the testator in the last instance may have been ineffectual to vest ownership of the legacies in such devisees, yet it evinced in an unmistakable way an intention to revoke the testamentary disposition he had previously made of it. Then again, are not

the introductory words of the undated will, "This is my last will, *which I write now,*" pregnant with meaning as to his intention? What will? The will that "I write now". The testator here departs from the customary use of formal words. Therefore, looking to the writings alone, we find that the testator in this case, within the meaning of the statute, has declared a revocation of his former will by impliedly saying in every clause thereof that the will he was then executing was his will and his complete and only will.

But, since the fact to be determined is one of intention, it may not wholly be one of written inconsistency or expression. Do not the facts surrounding the execution and publication of the papers in dispute give additional support to the revocation implied therein? It is a settled rule of practice, in such cases as this, to allow the surrounding circumstances to be shown so as to place the court, as far as may be in the position of the testator, at the time the last document was executed, in order to ascertain his intention. *Furbee* v. *Furbee,* 49 W. Va. 191; *Atkinson* v. *Sutton,* 23 W. Va. 197. The evidence adduced at the hearing in the circuit court shows that between the execution of the 1914 will and the undated will there had been a change in the objects of the testator's bounty. Dr. McSherry's wife had died. He had her interests uppermost in his mind at the execution of the first paper as the prefatory words "Believing that I am in duty bound to make a will to protect my wife and family" clearly show. Since he had indicated a joint executorship in the first paper, one of the parties so entrusted had suffered a nervous breakdown, resigned his position in the bank of which the testator was president, and moved to another state. It can hardly be said that the failure to denominate any executor in the later will, under the circumstances mentioned, implied a desire on his part that Rutledge be sole executor. Rather would it not inveigh most strongly to the contrary that inasmuch as the circumstances had changed since the making of his first will that he left the administration of his estate to one to be determined by the general law governing in such situations.

Again, as to the testator's intention, the facts surrounding the last hours of Dr. McSherry's life, are illuminating. That

he was in the right use of his mental faculties up to within an hour or two of his death is admitted. To persons in the household he expressed a desire that his will be found. From the admitted evidence we may believe that such search was in a measure under his direction. Mrs. Andrew, who for twenty-eight years was the housekeeper of the testator, was one of the persons engaged in such search, the day before and the day of his death. In answer to a question, "Where was it the search was being made for his will?" the following testimony was given by her: "A. At his desk where he had told me. * * * Q. Where were you looking for a will? A. In his desk. Q. In his office? A. In his office. Q. Was his office in his residence or somewhere else? A. In his residence." The undated will was found in his ledger by his step-granddaughter, Mrs. Dushane. Mrs. Andrews had seen it there but did not recognize it as being a will. In her words, "I saw it folded up, but I never thought of a will, and I didn't think it worth while to unfold it in the ledger." The will of 1914, according to the record, was found by some one the day previous to the testator's death, yet it is significant that the search continued until the finding of the undated will an hour or so before he died. Where and by whom the former will was found, other than it was found, does not appear in evidence. So, Dr. McSherry in his dying hours recognized the undated paper as his last will and testament.

Counsel for the plaintiff in error, however, contend that inasmuch as the testator preserved among his valuable papers both documents, the presumption is that he intended that the executors named in the first will should be the executors of his entire estate, and that the first will was properly admitted to probate to nominate executors, in order to preserve a muniment of title, if for no other purpose. It is true, that under the old law a decedent was said to die intestate, even though he left a will, if he did not nominate an executor. 1 Lomax on Executors, 165. Now, a will may be executed for the sole purpose of selecting an executor without making disposition of any of the property of the testator. 2 Schouler on Wills (5th ed.), sec. 1031. The reason for the later rule is apparent. The law now provides for the disposition of the estate. But

the will of 1914 was not written for the sole purpose of appointing executors. It made an entire disposition of the estate. The executors there named were commissioned to administer the estate in accordance therewith. Their duties ended there, save those responsibilities which the statute imposes for the benefit of the devisee or legatee or both. Their powers were confined to the instrument which appointed them. If this instrument is superseded by another, do not their powers and duties go with it? Under our statute an express revocation in a later will abrogates a former will. Had there been a clause in the undated will expressly revoking the former will, could it be contended for an instant that the rights of the executors named in the first will would not fall with it? Reason admits only a negative answer. The same result then would follow where there was an implied revocation as here.

The ruling of the learned judge, that the undated will was the only last will and testament of Dr. McSherry, was right. We decide nothing with respect to the status in which such will leaves his estate. With that we have no present concern; sufficient unto the day.

*Affirmed.*